UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| LIVING ECOLOGY, INC., | Case No. 2:18-CV-1647 JCM (NJK) |
| Plaintiff(s), | AMENDED ORDER |
| v. | |
| BOSCH PACKAGING TECHNOLOGY, INC., | |
| Defendant(s). | |

Presently before the court is defendant Bosch Packaging Technology, Inc.'s ("Bosch") renewed motion[1] for summary judgment. (ECF No. 54). Plaintiff Living Ecology, Inc. ("LEI") responded in opposition (ECF No. 61) to which Bosch replied (ECF No. 64).

**I.     BACKGROUND**

This case relates to a dispute regarding plaintiff LEI's purchase of certain food-product equipment from defendant Bosch. (ECF No. 54 at 2). The equipment at issue was designed to produce hundreds of chocolate-covered fruit balls in an assembly line sequence made up of four machine components.[2] (ECF No. 61 at 2). LEI purchased the machine in 2014 from Bosch for a contract price of $860,000. (*Id.* at 3). LEI argues Bosch's equipment was defective, that it was never accepted by LEI, and that LEI effectively revoked any

---

[1] The exhibits relied upon by the parties for this renewed motion are the same exhibits relied upon for the initial motion for summary judgment (ECF Nos. 26; 27), with the exceptions of Exhibits "C" (ECF No. 26-3) and "H" (ECF No. 26-8) which were resubmitted as ECF Nos. 54-1 and 54-2 to include missing deposition pages.

[2] Each machine component has its own unit number, (*See* ECF No. 26-9 at 2), but the parties dispute whether the four components constitute one machine in the aggregate, or two machines made up of two components. (*Compare* ECF No. 54 at 4 *with* ECF No. 61 at 3).

**James C. Mahan**
**U.S. District Judge**

acceptance that may have occurred. (ECF No. 61 at 2). Bosch counters that it stands by its equipment, that LEI accepted its equipment, and that any revocation of that acceptance was insufficient as a matter of law. (ECF No. 54 at 12, 17).

In July 2018, LEI filed an action in state court alleging that Bosch's equipment had never performed properly thereby entitling LEI to "recission[3] and restitution to put it back in the position it held prior to the execution of the [a]greement." (ECF No. 1 at 12). Bosch timely removed the case to federal court. (*Id.* at 1).

On May 6, 2019, Bosch filed its initial motion for summary judgment. (ECF No. 26). On December 9, 2019, the court granted Bosch's motion based on contractual limitations. (ECF No. 29). LEI appealed the court's decision to the Ninth Circuit Court of Appeals, which then reversed and remanded on December 24, 2020.[4] (ECF No. 47).

On February 26, 2021, the court issued an order denying Bosch's initial motion for summary judgment consistent with the Ninth Circuit's mandate and permitted Bosch to file a renewed motion for summary judgment. (ECF No. 53). Bosch so filed and the court now considers its renewed motion for summary judgment. (ECF No. 54).

## II.     LEGAL STANDARD

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled

---

[3] Nevada has adopted Article 2 of the Uniform Commercial Code (UCC) which applies to transactions in goods and addresses a buyer's options and responsibilities when there is a delivery of nonconforming goods. *See* NRS 104.2102. LEI's complaint alleges a single cause of action for recission. (ECF No. 1 at 12). In situations such as this, the UCC has largely abandoned the concept of "recission" in favor of the concept of "revocation of acceptance." *See* NRS 140.2608; *see also IMA N. Am. V. Maryln Nutraceuticals, Inc.*, No. CV-06-344-PHX-LOA, 2008 U.S. Dist. LEXIS 90131, at *4-5 (D. Ariz. Oct. 27, 2008) (concluding that most courts interpreting the UCC have interpreted it as "not expressly codify[ing] a buyer's common law right to equitable rescission and, instead substitute[ing] a buyer's right to reject or revoke acceptance with remedies under provisions similar to the remedy of equitable rescission, e.g., UCC § 2.602…and UCC § 2.608) (compiling cases).

[4] Specifically, the Ninth Circuit held that genuine issues of material fact existed surrounding whether the inclusion of certain terms and conditions—which purported to shorten the statute of limitations for all claims between the parties—were part of the parties' agreement. Bosch's renewed summary judgment does not reassert these contractual limitations claims. (*See* ECF No. 54).

to a judgment as a matter of law."[5]  FED. R. CIV. P. 56(A).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party.  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).  However, to be entitled to a denial of summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  *Id.*

In determining summary judgment, a court applies a burden-shifting analysis.  The moving party must first satisfy its initial burden.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

By contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co.*

---

[5] The court can consider information in an inadmissible form at summary judgment if the information itself would be admissible at trial.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.")).

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted.  *See id.* at 249–50.

**III.   DISCUSSION**

The gravamen of this dispute is whether LEI accepted the Bosch equipment, and if so, whether LEI properly revoked such acceptance.  The court finds that no genuine issue of material fact exists surrounding LEI's acceptance and lack of revocation of the Bosch equipment, and therefore, consistent with the following, GRANTS Bosch's motion for summary judgment.

**A.  LEI accepted the equipment**
  *1.  <u>LEI had a reasonable opportunity to inspect the equipment and it was conforming</u>*

Nevada law provides that "[a]cceptance of goods occurs when the buyer, after a reasonable opportunity to inspect the goods signifies to the seller that the goods are

**James C. Mahan
U.S. District Judge**

conforming or that he will take or retain them in spite of their non-conformity . . . ." NRS 104.2606(1)(a).

Here, LEI concedes that the equipment went through "five separate rounds of testing" in early 2015 at Bosch's factory in Viersen, Germany (ECF No. 61 at 6), and that LEI's engineer flew "back and forth from the United States to Germany" to observe[6] this process (ECF No. 1 at 9 ¶ 13). But LEI argues it did not have an "adequate" opportunity to inspect the goods to determine conformity because the tests "were unable to verify the equipment's ability to perform as intended," (ECF No. 61 at 6), and that it "had no option"[7] but to accept the recommendation from Bosch to ship the equipment upon completion of testing.[8] The court disagrees.

Even if it were true that traveling internationally to observe multiple trial tests over many months of an expensive piece of complex machinery and agreeing to have the equipment delivered and shipped thousands of miles away to its home factory was not "adequate" opportunity to inspect the machine, LEI had the additional opportunity to test and inspect the equipment upon its delivery at LEI's facilities in Henderson, Nevada. (ECF Nos. 54 at 6; 54-2 at 8–9). Indeed, once the equipment arrived at LEI's factory, Bosch employees conducted their standard site acceptance testing in the presence of LEI employees, after which LEI signed an "Acceptance Protocol" which unambiguously stated: "Herewith it is

---

[6] There is some dispute as to whether the LEI agents observed all five trials, but the court finds this detail immaterial. Even drawing the reasonable inference in favor of LEI that it did not observe *all* five tests, the record still clearly shows that LEI flew to Germany to participate, to some extent, in the factory testing of the equipment. (*See* ECF No. 1 at 9 ¶ 13).

[7] Specifically, LEI's CEO, Dr. Jack Singh, testified in his deposition that LEI felt it had "no option" but to accept shipment because LEI customers were "upset" and "screaming" for the product (i.e. the chocolate covered fruit balls that could only be produced with the Bosch equipment). (*See* ECF No. 54-1 at 31:11 and 38:5).

[8] Interestingly, LEI issued full payment in the amount of $860,000 for the equipment on November 14, 2014, prior to this testing. (ECF No. 54-1 at 2-3).

James C. Mahan
U.S. District Judge

- 5 -

1  confirmed, that the delivered machine/packaging line is handed over today and **accepted** by
2  the customer according to the agreed sales contract."⁹  (ECF No. 26-9) (emphasis added).

3  LEI maintains that it never "accepted" the equipment during the various stages of
4  payment, inspection, and delivery because these actions were performed with the
5  understanding that Bosch would send technicians to ensure the equipment was entirely
6  "operational."  (ECF No. 61 at 3).

7  The crux of LEI's argument, therefore, is a fundamental misunderstanding of
8  expectations between the parties surrounding the expected output of the equipment.  LEI
9  argues that the contract clearly holds Bosch to the expectation of 600 pieces per minute while
10  Bosch avers that this was merely a desirable "target," not a promise.  It appears that this
11  fundamental difference in expectations drives the entire controversy.

12  Looking at Bosch's proforma invoice and LEI's purchase order,¹⁰ the court finds that
13  the plain text of the documents supports Bosch's view that the expectation was a *target*, not
14  definitive, output of 600 pieces per minute.  (*See* Exs. A & B).

15  . . .
16  . . .
17  . . .
18  . . .
19  . . .
20  . . .
21  . . .

---

⁹ LEI submits that it construed the "Acceptance Protocol" document as acceptance "for installation purposes only, not operational purposes."  (ECF No. 61 at 9).  The court finds this explanation unavailing and unsupported by the record.

¹⁰ The court notes that the issue of the incorporation of the alleged "2014 Terms and Conditions" into the sales contract was already adjudicated by this court (ruling at first that they were incorporated), but with the Ninth Circuit reversing and remanding, finding that there *were* genuine disputes of material fact as to that incorporation into the contract.  (ECF No. 47 at 5).  Because the parties do not reference the 2014 Terms and Conditions in their renewed summary judgment motion and responses, the court will not consider any of the purported 2014 Terms and Conditions in its analysis here.

**James C. Mahan**
**U.S. District Judge**



Exhibit A

Exhibit B

James C. Mahan
U.S. District Judge

Significantly, Bosch's proforma invoice, Exhibit A, *supra*, clarifies that the "**final output is subject to laboratory tests with [LEI's] original product**." (ECF No. 26-1 at 3) (emphasis added).

Even against this backdrop, LEI maintains that it expected the machine to produce 600 pieces per minute, and that anything less was nonconforming. LEI points to the "contract documents and communications between [LEI CEO] Dr. Singh and representative of Bosch" as confirmation of its expectation. (ECF No. 61 at 12). Upon closer examination, the "contract documents and communications" referenced by LEI merely contain conclusory allegations unsupported by factual data that the court is not required to accept.[11] (*See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (a nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data).

What is more, the communications between the parties themselves belie the notion that 600 pieces per minute was the clear expectation.

For instance, LEI wrote to Bosch in May 2016 and June 2016, stating that the "excessive accumulation of product so quickly does not allow us to reach anywhere near the **500 ball [sic] per minute as the machine was specified to produce.**" (ECF Nos. 26-7 at 4; 26-11).

LEI therefore asked Bosch to "[p]lease provide your opinions [sic] to this problem, as we have committed to our customers to provide this product in the **500 balls per minute**

---

[11] For example, LEI cites to the proforma invoice and purchase order as "proof" of this contractual obligation—an argument that is belied by the plain text of the agreements (*see* Exs. A & B). Additionally, it cites to Dr. Singh's deposition testimony, which offers only conclusory comments about "conversations" he had with Bosch that confirm the 600 pieces per minute rate (ECF No. 27-2 at 7–8). Dr. Singh mentions emails with a Bosch salesman, Mr. Miguel, who allegedly communicated an expectation of 600 pieces per minute, but, curiously, LEI does not provide these emails as part of the record for the court to consider. (*Id.*). These emails are also mentioned in Dr. Singh's declaration, but with no further citation. (ECF No. 27-11 ¶ 13).

But even if the emails were attached to the record, it is unlikely they would form the necessary proof to illustrate a 600 pieces per minute contractual expectation since Nevada law does not allow "parol or extrinsic evidence…to add to, subtract from, vary, or contradict written instruments which dispose of property, or are contractual in nature and which are valid, complete, unambiguous, and unaffected by accident or mistake." *M.C Multi-Family Dev., L.L.C. v. Crestdale Assoc., Ltd.*, 124 Nev. 901, 913–914 (2008).

James C. Mahan
U.S. District Judge

- 8 -

**rate** as we originally purchased this [e]quipment." (ECF No. 27-7 at 4) (emphasis added). Bosch responded a few days later, writing:

> …it is and was clear that your product mass is not easily handled in a ball forming process. That is why we did many trails [sic] in our lab together with you and **this is why we never confirmed a final output in our contract** – this was always depending [sic] on the trials. Anyhow[,] during [factory acceptance testing] here in Germany as well as during [site acceptance testing] in Las Vegas we (your [sic] and our team) were able to demonstrate that the machine is **capable of running stable at rates above 500 balls per minute**…we are convinced that the machine itself has a very stable and proven design. **The limitation of the performance is always depending [sic] on characteristics of the product itself as well as process parameters.** Having said this I know that you have a very good ball forming equipment. And of course we will support you in getting the maximum performance and efficiency for your product mass.

(*Id.* at 2) (emphasis added).

From these communications, it appears that LEI's repeated assertions of a 600-balls-per-minute expectation is contradicted by the record. Thus, there does not appear to be a genuine issue of material fact that an actual output *below* the target of 600 balls per minute is nonconforming.

Notably, the record is replete with evidence that Bosch attempted to optimize and fine-tune the equipment to help reach its max capacity production, which may or may not have resulted in the target output of 600.[12] LEI points to this fact as evidence that the equipment was nonconforming while Bosch asserts that it was merely complying with its contractual duties to help maximize the output of the equipment.

Even to the extent the court draws an inference in favor of LEI that the equipment was nonconforming, the court finds that, pursuant to NRS 104.206, LEI accepted the equipment since it had a "reasonable opportunity" to inspect the equipment and retained it "in spite of its nonconformity."

. . .

. . .

---

[12] For instance, Bosch technicians tweaked and adjusted the machine for adaptation—*e.g.*, sending out "stainless-steel replacement parts" once the machine was in Nevada (ECF No. 27-4 at 12, and *passim*)—because this was the first time the equipment was used to produce chocolate-covered fruit balls. (*See* ECF No. 27-4 at 7). (Bosch notes that the machine had been successful in producing 1,500 balls per minute for many other candy applications. (*Id.* at 2).)

James C. Mahan
U.S. District Judge

- 9 -

### 2. *LEI did not reject the equipment within a reasonable time after delivery*[13]

The court further finds that LEI failed to reject the goods "within a reasonable time after delivery" pursuant to NRS 104.2606(1)(b). The equipment was delivered to LEI in Henderson, Nevada in September 2015, and according to the record, LEI first began rejecting the equipment in May 2016, nearly seven months after the equipment was installed at LEI.

While seven months may not seem like an unreasonable amount of time to reject such a complex piece of machinery, the court notes that LEI rejected the enrober/cooling unit—the second part of the machine[14]—*within a couple weeks of installation*, and Bosch allowed return of these components by issuing a refund of $155,000 plus a $25,000 service credit. (ECF No. 54 at 7).

LEI maintains that it "repeatedly expressed doubts to Bosch about the [equipment's] ability to perform per the contract" (ECF No. 61 at 4) but did not send its first potential rejection until May 2016 (ECF No. 26-11), followed by a demand for cure or a refund in June 2016 (ECF No. 27-7 at 3), finally followed by a demand for rescission in May 2018 (ECF No. 1, Ex. A at ¶ 25).

The court finds that these actions of potential rejection of the goods were not within a reasonable time after delivery.

### 3. *LEI engaged in acts inconsistent with the seller's ownership*

NRS 104.2606(1)(c) states that acceptance of goods may also occur when the buyer "does any act inconsistent with the seller's ownership."

The record shows that after submitting payment in full in November 2014, LEI CEO, Jack Singh executed a transfer of ownership in December 2014, which stated that "Living

---

[13] Although the court finds that LEI accepted the goods under NRS 104.2606(1)(a)—to wit, that LEI had a reasonable opportunity to inspect the equipment as conforming or retain it in spite of its nonconformity—the court analyzes the remaining provisions of acceptance under NRS 104.2606 for good measure.

[14] The first part of the machine—extruder/ball forming unit—is what is at issue in this case; the rejection of the enrober/cooling unit has already been resolved.

**James C. Mahan**
**U.S. District Judge**

- 10 -

Ecology Inc. confirms that title of ownership with respect to the above mentioned equipment will be transferred to Living Ecology Inc. on December 19th." (ECF No. 26-7 at 2).[15]

Additionally, Mr. Singh authorized shipment of the equipment following the factory testing in Germany from December 2014 to May 2015, (ECF No. 54-1 at 31); and an agent of LEI signed Bosch's acceptance protocol form upon completion of the installation in Nevada on October 1, 2015. (ECF No. 26-9).[16]

The court finds that these numerous acts performed by LEI were inconsistent with Bosch's ownership of the equipment and thereby constituted acceptance of the equipment as a matter of law.

### 4. *Because LEI accepted* part *of the equipment, it accepted the* entire *unit, pursuant to NRS 104.2606(2)*

The parties dispute whether the equipment is perceived as a single unit made up of four components or two units, each of which were made up of two components. This is an important distinction when considering acceptance because the court must determine the "umbrella" unit so it can ascertain if acceptance of *part*—and thereby all—of the unit occurred.

Bosch contends that while LEI may have rejected three parts of the unit (the enrober, the cooler, and the ball former), it never rejected the extruder. LEI asserts it not only rejected the enrober/cooler as one unit of the machine, but also the extruder/ball former.

A simple reading and application of NRS 104.2606(2) to the facts at hand, however, illustrates that even accepting LEI's view, LEI never rejected the extruder. LEI's primary issue was with the ball former, and LEI admits that it continued to use the extruder after its putative revocation, in order to "mitigate its damages." (ECF No. 61 at 15). Thus, since LEI

---

[15] Mr. Singh apparently had some misgivings about the document's assignment of liability for any damage caused to the equipment while it was held in Germany, but he does not contest that he signed the transfer of ownership transferring title of the equipment to LEI. (ECF No. 54-1 at 7–12, Deposition of Jack Singh).

[16] LEI does not dispute that any of these actions occurred; it simply argues that these acts were performed based on "assurances" that Bosch could get the equipment producing 600 pieces per minute, which, as the court has already discussed, *supra*, Part III.A.1, was an errant reliance.

**James C. Mahan**
**U.S. District Judge**

- 11 -

accepted the extruder—which is one component of the extruder/ball former unit—it accepted the entire unit, including the ball former.

### B. LEI did not revoke acceptance of the equipment in whole or in part

Because the court finds that LEI accepted the equipment as a matter of law, the court now turns to revocation. Nevada law states that:

> 1. The buyer may revoke his or her acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to the buyer if the buyer has accepted it:
> (a) On the reasonable assumption that its nonconformity would be cured
>
> and it has not been seasonably cured; or
>
> (b) Without discovery of such nonconformity if his or her acceptance
>
> was reasonably induced either by the difficulty of discovery before
>
> acceptance or by the seller's assurances.
>
> 2. Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in the condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
> 3. A buyer who so revokes has the same rights and duties with regard to the goods involved as if the buyer had rejected them.

NRS 104.2608

The court finds that LEI's alleged revocation was invalid as a matter of law since it was not based on a "reasonable assumption that its nonconformity would be cured." As set forth above, *supra*, Part III.A.1, LEI's assumption that Bosch would (or could) get the equipment to conform to a 600 pieces per minute output was unreasonable based on the plain terms of the parties' agreement and the evidence in the record.

Further, LEI submits that Bosch's equipment contained a "hidden design flaw" that will never allow it to "produce the numbers specified at purchase." (ECF No. 27-7 at 4). However, that design "flaw" was anything but hidden or difficult to discover. In fact, just the opposite. The record is clear that the factory testing in Germany and the site testing in Nevada showed that the equipment was not going to produce chocolate covered fruit balls at 600 pieces per minute, (ECF No. 27-7), and LEI has not adduced any evidence even hinting

James C. Mahan
U.S. District Judge

to the contrary. LEI's own evidence evinces a conflicting expectation of 500 pieces per minute. (ECF Nos. 26-11; 27-7 at 4).

Accordingly, the court finds that no genuine dispute of material fact exists as to LEI's lack of revocation of its acceptance of Bosch's equipment in whole or in part.

## IV.   CONCLUSION[17]

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant Bosch's renewed motion for summary judgment (ECF No. 54) be, and the same hereby is, GRANTED.

The clerk of the court is instructed to enter judgment for defendant Bosch and close the case.

DATED May 5, 2022.

_____
UNITED STATES DISTRICT JUDGE

---

[17] This was a classic case of miscommunicated expectations; and a cautionary tale for careless business practices accompanied by fatally inchoate contractual terms. Astonishingly, the parties did not clearly execute a standard long-form agreement for the purchase of a complex piece of equipment valued at close to one million dollars. Instead, the court was left to divine the parties' expectations through a piecemeal invoice and purchase order.